IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDGAR DIAZ, RICKEY ROLLINS, DON JOHNSON, ROBERT CALLOWAY, DORNELL ELLIS, EMILE FORT, CHRISTOPHER BYES, PARIS RAGLAND, RONNIE CALLOWAY, ALLEN CALLOWAY, and REDACTED DEFENDANTS NOS. ONE & TWO,<br><br>Defendants. | No. CR 05-0167 WHA<br><br>**ORDER DENYING DEFENDANT BYES' MOTION TO SUPPRESS EVIDENCE** |

**INTRODUCTION**

In this RICO gang prosecution, defendant Byes moves to suppress evidence obtained as a result of a traffic stop and body search on May 13, 2005. An evidentiary hearing was held on October 18, 2006, during which one of the arresting officers, Officer Michael A. Murphy, testified. For the reasons below, defendant Byes' motion is **DENIED**.

**STATEMENT**

On May 13, 2005, defendant Byes was riding as a passenger in a vehicle driven by a Mr. Rose.[1] Only a week earlier, Mr. Rose was warned by San Francisco Police

---

[1] The parties refer to Mr. Rose by different names. Defendant's brief refers to Mr. Rose as "Manuel," while the government's brief and Officer's Murphy's declaration refer to him as "Maurice."

1  Officer Valiquette and San Francisco Police Officer Murphy about driving without a valid
2  driver's license. On the day in question, these same officers saw Mr. Rose driving again.
3  They pulled the vehicle over at the intersection of Santos Street and Brookdale Avenue, an
4  intersection within the territory of the Down Below Gang ("DBG"). Specifically, this area
5  was the central gathering place for DBG members. The officers were aware that this was a
6  high-crime area and that the DBG was a violent gang prone to carrying and using weapons
7  (Br. at 2; Murphy Decl. ¶ 2, 3).

8  Officer Valiquette approached the vehicle on the driver's side. When Mr. Rose failed to
9  produce a valid driver's license, Officer Valiquette put Mr. Rose in handcuffs and led him back
10 to the vehicle. Officer Murphy then approached the passenger side of the vehicle where
11 defendant Byes was seated. There was a strong odor of burnt marijuana in the vehicle.
12 Officer Valiquette pointed out to Officer Murphy that there was a marijuana cigarette in the
13 ashtray of the vehicle. At that point, Officer Murphy asked defendant Byes to exit the vehicle
14 and placed him in handcuffs. There was also a strong smell of *un*burnt marijuana on both
15 Mr. Rose and defendant Byes when they were away from their vehicle; the smell of unburnt
16 marijuana is indicative of the presence of fresh marijuana which may be for sale. After placing
17 Mr. Rose and defendant Byes in handcuffs, Officer Valiquette discovered two packs of empty
18 baggies in the back of the vehicle. These types of baggies are commonly used in packaging
19 narcotics. A crowd of ten to twelve people began to gather at the scene, including five to six
20 DBG members. The officers decided to transport the two men to the police station to continue
21 their investigation. Officer Murphy testified that he did so because he was concerned for his
22 safety at that point (Br. at 2; Murphy Decl. ¶ 6–11).[2]

23 At the police station, Mr. Rose was arrested because there was an active warrant for his
24 arrest. The police advised Mr. Rose of this and proceeded to strip search him. The police
25 discovered fourteen small Ziploc baggies safety-pinned to the inside of Mr. Rose's pants.
26 Smelling the same odor of unburnt marijuana on defendant Byes, the police decided to strip

---

[2] At the hearing, defendant would not stipulate to the entry of the police report into evidence.

2

search defendant Byes as well. While walking defendant Byes back for to a cell in order to search him, defendant Byes asked Officer Murphy if he could use the bathroom. The officer advised him that he could use the restroom after the search. Eight small Ziploc baggies were discovered on defendant Byes, pinned to the inside of his pants in a similar fashion as Mr. Rose. Officer Murphy then asked defendant Byes to "turn around, spread his cheeks, and cough." A golf ball-sized bag of a white substance was discovered between defendant Byes' buttocks. This bag contained fifty-one small wrapped rocks of base rock cocaine (Br. at 2–3; Murphy Decl. ¶ 12–15).

## ANALYSIS

### 1. THE OFFICERS DID NOT UNLAWFULLY ARREST DEFENDANT BYES.

This order focuses on the officers' conduct before the strip search and considers whether that conduct constituted an unlawful arrest and search without probable cause. The Ninth Circuit has succinctly stated:

> There is no bright-line rule to determine when an investigatory stop becomes an arrest. Rather, in determining whether stops have turned into arrests, courts consider the "totality of the circumstances." As might be expected, the ultimate decision in such cases is fact-specific.
>
> In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, *i.e.*, the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. In short, we decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*. . . . The relevant inquiry is always one of reasonableness under the circumstances.

*Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citations omitted). "[W]hether an arrest has occurred depends upon an objective, not subjective, evaluation of what a person innocent of a crime would have thought of the situation, given all of the factors involved." *United States v. Johnson*, 626 F.2d 753, 756 (9th Cir. 1980).

This order finds that after the officers saw the marijuana cigarette and smelled marijuana emanating from the vehicle, Officer Valiquette and Officer Murphy had a reasonable suspicion

3

1  that some criminal activity may have been afoot.  The detention and transport of Mr. Rose and
2  defendant Byes, albeit in handcuffs, was justified while they searched the vehicle.
3     Under ordinary circumstances, when the police have only reasonable suspicion to make
4  an investigatory stop, "drawing weapons and using handcuffs and other restraints will violate the
5  Fourth Amendment." *Washington*, 98 F.3d at 1187.  The Ninth Circuit has held, however, that

> we allow intrusive and aggressive police conduct without deeming it an arrest in those circumstances when it is a *reasonable* response to legitimate safety concerns on the part of the investigating officers. . . . This doctrinal flexibility allows officers to take the steps necessary to protect themselves when they have adequate reason to believe that stopping and questioning the suspect will pose particular risks to their safety.

10 *Id.* at 1186.  The officers' use of "handcuffing substantially aggravates the intrusiveness of an
11 otherwise routine investigatory detention and is not part of a typical *Terry* stop." *United States*
12 *v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).  As the Ninth Circuit has mentioned, "a
13 distinction between investigatory stops and arrests may be drawn at the point of transporting the
14 defendant to the police station." *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988).
15 However, safety and security concerns can justify relocating a suspect during an investigatory
16 *Terry* detention.  *Eberle v. City of Anaheim*, 901 F.2d 814, 819 (9th Cir. 1990).
17 Under *Washington*, handcuffing, and transporting Byes would only be justified if those were
18 reasonable responses to the officers' legitimate safety concerns.
19     Evaluating the totality of the circumstances in this location, the use of handcuffs and the
20 transport during this investigatory stop of Mr. Rose and defendant Byes was justified.  The
21 police officers had ample reasonable suspicion, bordering on probable cause.  Both men were
22 known members of the DBG, and the stop took place in a central DBG location.  Having been
23 assigned to the Sunnydale district for a few years, Officer Murphy was well aware that of the
24 potential for danger in this area.  He testified that he had a person die in front of him in that very
25 intersection, and had made a number of arrests for both guns and drugs in the immediate vicinity
26 of the intersection.  Graffiti on the nearby basketball court read "Fuck Ali," in reference to
27 Sergeant Ali, a sergeant in the Sunnydale district.
28

4

While investigating the vehicle, a crowd began to gather. Officer Murphy testified that about half of the people in the ten to twelve person crowd were recognizable to him as DBG members. While Officer Murphy had never had a detain person taken from him by an angry mob, he was aware of the hostility towards police in general in the area. Due to these reasonable concerns for their safety, the officers decided to move the investigation to the police station. While the officer acknowledged he could have done other things, he felt the safest and most efficient choice was to take the men into the station. This order finds that because of the safety concerns due to the gathering crowd and the potential escalation of violence, it was reasonable for the officers to relocate their investigation to the station house. This order finds that in light of these dangerous circumstances, it was reasonable for the officers to place defendant Byes in handcuffs and transport him to the police station while they investigated the vehicle.

### 2. THE OFFICERS HAD PROBABLE CAUSE TO STRIP SEARCH DEFENDANT BYES.

A strip search must be supported by probable cause. It is too intrusive to be permissible under a *Terry* stop; the government must prove that the police had sufficient probable cause when they strip searched defendant Byes. *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988). Whether probable cause exists depends upon the totality of the circumstances, and there must be a fair probability that contraband or evidence of a crime will be found in the particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Leading up to the strip search at the station house, officers had first noticed the odor of marijuana emanating from the vehicle defendant Byes was riding in, and also noticed the odor emanating from him individually. *Johnson v. United States*, 333 U.S. 10, 13 (1948) ("presence of odors . . . might very well be found to be evidence of most persuasive character" in determining if probable cause exists)*; See United States v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) ("odor of marijuana on Blackstone and the marijuana pipe lying in plain view constituted probable cause for [the search of the defendant's vehicle]"). Their search of the vehicle yielded empty plastic baggies, known to the officers to be indicative of packaging drugs for sale. While probable cause must be specific to the individual to be searched, *United States v. Robertson*, 833 F.2d 777, 783 (9th Cir. 1987), the small bags of marijuana had been found on

5

Mr. Rose when police searched him increased the probability of finding something similar on defendant Byes given that both men were in the vehicle. *See Maryland v. Pringle*, 540 U.S. 366, 372 (2003). Most importantly, defendant Byes asked to use the bathroom when he was told the officers were going to strip search him. It is "common knowledge that drug users and dealers conceal controlled substances on their persons and often attempt to flush drugs down the toilet when law enforcement agents suddenly appear on the scene." *Burns v. Loranger*, 907 F.2d 233, 238 (1st Cir. 1990). Evaluating the totality of the circumstances — the officers smelling the odor of marijuana emanating from both the vehicle defendant Byes was riding in and on his person, finding the Ziploc baggies which suggested packaging drugs for sale, finding marijuana packed for sale on defendant's associate, and defendant asking to use the bathroom when he was told he would be searched — the officers had probable cause to search defendant Byes. Because there was probable cause to search defendant, it is irrelevant whether the search yielding cocaine between defendant's buttocks was still a strip search or amounted to a body cavity search. *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1449 (9th Cir. 1991) (a body cavity inspection must be justified by probable cause).

While defendant Byes argues that *United States v. Soyland*, 3 F.3d 1312 (9th Cir. 1993), requires suppression of this evidence because defendant Byes was simply a passenger in the vehicle, that case is distinguishable from the present situation. In *Soyland*, an immigration agent asked the driver of the vehicle to drive into a secondary inspection area (the defendant was a passenger in this vehicle). When the driver got out of the car to open the rear of the car, the agent smelled methamphetamine. The agent did not smell the drug again. The Ninth Circuit held that there was not a sufficient link between the passenger and the odor to establish probable cause, and that he should not be punished by virtue of his mere presence in the vehicle. In the instant situation, Officer Murphy smelled unburnt marijuana on defendant Byes' person. This distinction is important because it establishes that *this* passenger may have been involved. In *Soyland*, the odor only came from the car and not the passenger's person as it did here.

This order finds that, under the totality of the circumstances, the officers had probable cause to search defendant Byes' person.

6

**CONCLUSION**

For the above mentioned reasons, defendant Byes' motion to suppress the evidence obtained as a result of the traffic stop on May 13, 2005, is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 23, 2006.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE